**LAW OFFICES OF KIMBERLY A. ECKERT**
1050 East Southern Avenue Suite A3
Tempe, Arizona  85282
(480) 456-4497 Fax (866) 583-6073
Kimberly A. Eckert – 015040
keckert@arizlaw.biz
**Attorney for Plaintiffs**

## UNITED STATES DISTRICT COURT
### DISTRICT OF ARIZONA

| | |
|---|---|
| June Durr, an individual and Loyalty Restaurant & Lounge LLC dba Loyalty Lounge, an Arizona Limited Liability Company, | Case No. |
| Plaintiffs, | **Complaint** |
| v. | **(Jury trial requested)** |
| City of Scottsdale, a municipal entity; Christian Bailey, an individual and acting under the color of law; Stephen Smith, an individual and John and/or Jane Does I-X, individual(s) acting under the color of law, | |
| Defendants. | |

Plaintiffs June Durr and Loyalty Restaurant & Lounge LLC dba Loyalty Lounge, hereby file their Complaint against Defendants and allege as follows:

1.     Plaintiff June Durr ("Durr") is an individual and at all relevant times was a resident of Maricopa County, Arizona.

2.     Plaintiff Loyalty Restaurant & Lounge LLC dba Loyalty Lounge, is an Arizona Limited Liability Company doing business in Arizona. Plaintiff Durr is the sole Member and authorized to represent the interests of said company.

3.  Defendant City of Scottsdale ("COS") is a municipal entity within the geographic bounds of Maricopa County, Arizona.

4.  The Scottsdale Police Department ("SPD") is and was at all times relevant hereto a City of Scottsdale agency, providing the vehicle through which the City of Scottsdale conducts its business.

5.  Defendant Christian Bailey ("Bailey") is an individual and at all relevant times was a resident of Maricopa County, Arizona. Bailey was at all relevant times employed by SPD as a duly appointed and sworn police officer, and was acting in his individual capacity and/or under the color of state law, and within the scope of his employment.

6.  Defendant Stephen Smith ("Stephen Smith") is an individual and at all relevant times was a resident of Maricopa County, Arizona. Smith was at all relevant times employed by Scottsdale as a zoning officer, and was acting in his individual capacity and/or under the color of state law, and within the scope of his employment.

7.  At the time of events relevant herein, the individual Defendants were acting within the course and scope of their employment with City of Scottsdale, a governmental entity.

8.  Defendants John and/or Jane Does are the unnamed, as-yet unidentified individuals, including but not limited to any and all police officers that were present during the incidents and may be responsible in part for the actions/inactions described herein.

9.  The acts or omissions giving rise to the claim occurred in Maricopa County, which is located in the District of Arizona.  Venue is therefore appropriate.

10.  This Court has original jurisdiction over all civil actions arising under the Constitution of the United States, as well as laws and treaties of the United States pursuant to 28 U.S.C. § 1331.  This action is in part based on alleged civil rights

violations under 42 U.S.C. § 1983 and the U.S. Constitution, and thus, jurisdiction in Arizona District Court is appropriate.

11.    The Arizona District Court also has supplemental jurisdiction over all other related claims which stem from the same case or controversy under Article III of the United States Constitution. *See* 28 U.S.C. §§ 1331 and 1367.

12.    Plaintiffs demand a jury trial on all issues triable by a jury.

13.    At all relevant times, Jeff Walther ("Walther") was the Chief of Police (or interim) for the City of Scottsdale Police Department ("PPD") with the ultimate authority to control and supervise and is responsible for the actions of its officers and agents. SPD, through Walther has the authority and responsibility to establish policies, practices, customs, procedures, protocols and training for the SPD and thus the City of Scottsdale.

14.    The City of Scottsdale and Defendant Bailey were served with a Notice of Claim in this matter pursuant to A.R.S. § 12-821.01 as to State Claims.

15.    Plaintiff June Durr is a Black female who opened up a business called Loyalty's Restaurant and Lounge on March 9th, 2021. The business serviced the Old Town community and surrounding areas and was instantly successful because it brought culture to a community that had no establishments that offered opportunities for Black families and friends to gather and enjoy themselves in an environment that welcomed them and accepted them. People of color felt at home as Loyalty's was a place where the color of your skin did not dictate the type of service you would receive.

16.    Loyalty's Restaurant was so successful that in a short period of time, it was named restaurant of the year by a local media outlet, voted on by the customers, approximately 9 months into operation.

17.    In May of 2021, Plaintiff Durr, was invited to meet with Defendant Bailey as the liquor liaison and Officer Dan Safsten, as the safety officer, both of the Scottsdale Police Department. This meet and greet surprisingly turned into an impromptu liquor inspection at the establishment and multiple officers showed up.

18.    Defendant Bailey led this inspection which was the start of the harassment and targeting of this Black, female owned business. The inspection was more about Plaintiff Durr's family including her son JaVon being a "hidden owner," her bank account, finances, deposits, her son's history, her employee contact log, who controlled the operation and other improper, harassing and disparate treatment from other businesses.

19.    Plaintiff Durr felt very uncomfortable, she felt attacked and contacted her operations managers and her son, all came to the premises or were on the phone as the inspection was midway through.   These individuals were contacted because generally they are around for day to day operations when Plaintiff Durr was back and forth to Michigan finishing up her retirement process from her job in Michigan set for July of 2021.

20.    This inspection led to the creation of an unbelievably false report made by Defendant Bailey and possibly other members of his team. He sent this false report  to the State Liquor Department. As a result, Plaintiff Durr was subjected to subpoenas of her bank records, probing into her families' businesses, and a false arrest of her son for alleged liquor violations.

21.    The findings reported from the inspection on the sheet that they filled out was that there was no employee log that was satisfactory according to Defendant Bailey and Mr. Safsten even though there was one on file and a updated emailed copy was sent to them during the time of the inspection. They even tried to get Plaintiff Durr to sign a blank inspection form at the completion proclaiming they would complete the paperwork when they got back to their office. Plaintiff Durr disagreed and demanded that it be completed with their findings noted and she photographed it after she signed it.  SPD never signed it and still put no employee log, a false statement.

4

22.     Plaintiff Durr was the sole 100% owner of this business, not her son, a fact that Defendants refused to acknowledge in their attempts to shut down this Black, female owned business before it even was up and running.

23.     This arrest lead to 10 miscellaneous tickets, all of which were dismissed in court, costing thousands in legal fees.

24.      Based on this information, the State Liquor Department reviewed the case and after a few months gave a warning and explained to Plaintiff Durr what she needed to do to have staff assist during her absence.

25.     Defendants' targeting and harassment continued at intervals over the duration  of ownership with short breaks in between. Every incident that occurred near the restaurant, Defendants blamed the business. After multiple meetings and efforts to dissolve the ill feelings SPD had with this Black, female owned business, the acts of targeting lightened some but then Defendant Bailey attempted to accuse the restaurant of operating like a bar stating they needed a different liquor license, different permits etc.

26.     The building had a live entertainment permit attached permitting live entertainment that Defendants even tried to have removed.

27.     After not receiving the desired results after their first attempt with State Liquor Department, based on a written investigative report from a officer at State Liquor Department, SPD had made multiple other attempts at reporting and making false accusations /complaints about this Black owned business. It was also mentioned that neighboring businesses were complaining because they were losing business due to the overwhelming response that Loyalty's restaurant was receiving. One neighboring business had asked Loyalty's to advertise their restaurant business on their website.

28.     Plaintiff Durr went around and introduced herself to several neighboring businesses with mixed responses.  Any negative incidents in the area were being blamed on Loyalty's by Defendants which then made the other businesses feel uncomfortable. Some were even illegally dumping trash in Plaintiffs' canisters.

29. Plaintiff Durr went to Zoning and spoke to a clerk one day and was told that the SPD had been speaking to the Zoning department about Loyalty's. She went by given the allegations by Defendant Bailey to see if there had been any changes with her entertainment permit, which there was not, and asked for management and left a message.

30. Defendant Smith and the owners of the building appeared angry because Loyalty's put up a privacy fence due to the harassment of Scottsdale police just parking in the rear looking in and targeting patrons enjoying themselves and pulling them over after leaving the establishment, harassing them.

31. The building owner and Defendant Smith demanded that the fence be removed immediately as it was not authorized by the zoning and permit department the fence had to be removed within a few days or threats for citations was mentioned. Loyalties complied despite the request being done only due to the harassment.

32. Defendant Smith began to write citations and noncompliance notices and claims with the State of Arizona and fines to the establishment. He also would send these notices to Plaintiff and the business which would then put them in a default status with the lease.

33. After all of this harassment and incomplete and false reporting by the Scottsdale police department to the Arizona Liquor Board, on June 17, 2022, Loyalty Lounge was shut down. Plaintiffs' license was later surrendered due to them being told that the information from the Defendants would result in a revocation of the license and inability to ever obtain a new one. Loyalty's was shut down operations suspended indefinitely based on accusations alleging that this Female Black owned business called Loyalty's and her patrons are running a business that jeopardizes the Public Safety of the community yet there has been no shootings, deaths, injuries etc. INSIDE of Loyalty's or involving any of their staff. Whenever something happened in the area, SPD put a report in the news accusing the restaurant to somehow be the cause resulting in the restaurant ending up in the news reports. There were never any definitive findings that linked

6

Loyalty's to community incidences even as there were video recordings of some of the incidents claimed such as a shooting across the street.  Defendant Bailey was there, unlawfully broke locks, entered the building, broke doors down etc. looking for evidence to link Loyalty's to violence. On that one occasion, patrons were turned away and business delayed opening despite no link to Loyalty's.

34.    Defendant Christian Bailey was part of that destructive move that was truly embarrassing; patrons were photographing and putting this on social media which made it appear that they had major issues going on after no findings. Plaintiffs had to pay for all the repairs and they opened and continued business as usual yet no one reimbursed them for the thousands spent on those repairs that Defendants caused.

35.    There were two series of false actions by the Defendants that led to the shut down - the first related to false information regarding an audit as to the percentage of food versus the alcohol served. The second is as to false allegations of violence at the establishment. The Liquor Board relied on these claims to ultimately shut down Plaintiffs' business.

36.    The Scottsdale zoning department also sent notices of noncompliance to Plaintiffs' landlord that contained false information and filed citations against the owners and individuals based on that false information by Defendant Christian Bailey and Stephen Smith.

37.    On June 7, 2022 after beginning to reach out for help, Plaintiff Durr contacted the Justice of the peace, Mayor, Senator, and NAACP, making multiple calls crying for help. She was referred to the Internal Affairs Depart from the Justice of the Peace and set up a meeting with "Peter and Mr. Coffee." She even shared a little footage of the harassing actions of the SPD to her, her staff, her family and her patrons, placing Scottsdale directly on notice of the issues. This harassment included harassing customers and staff of Loyalty, checking car doors, looking in car windows, searching for weapons, and other conduct that was based on racial bias towards the Plaintiffs.

7

38.     She was told she would get a follow up regarding her report/complaint but she never heard a word back. After 14 months of failed efforts to receive an approved Public Safety Plan for her establishment, she finally received one, only to be considered in violation by Defendant Bailey within 10 days of approval when he accused the establishment being accused of failing to report an incident that never occurred but reported by an "anonymous person.

39.     However, the harassment continued and on June 14, 2022, another false report from Defendant Bailey and the SPD was created and sent over to the State Liquor Department. This report alleged that there were violent acts outside of the establishment that involved guns and the establishment did not notify the police.

40.     Defendant Bailey alleged in the report and stated to the owner that an "innocent bystander" reported this information. Some patrons were denied entry because they wore full face masks during the pandemic, however, staff explained that they could wear masks but not full face masks. They were not willing to comply and were denied entry Defendant Bailey's report was quite different that he created and submitted to State Liquor which lead to the establishment being shut down the weekend of Juneteenth aka the black 4th of July a holiday that blacks largely celebrated. No major concerns were expressed to the staff of Loyalty's. Defendant Bailey claimed he was simply gathering information which was followed with more questions the next day, a clear fishing expedition.

41.     Ironically, when an officer showed up after the anonymous tip to Loyalty's the night of the alleged acts of violence, things were very calm and there were no reported concerns by the officer.

42.     The first hearing on the Zoning citations was dismissed due to an incorrect filing. The second hearing after a refiling was delayed by a claim that Officer Bailey was not available.  Plaintiffs assert that these were intentional delays in conjunction with the

landlord who continued to collect rent and use it as a basis to not approve a transfer of the lease.

43.    Plaintiffs were forced to plead guilty to a zoning violation in order to try and save the business.

44.    The information related to the alleged violence was provided to the Liquor Board was that on June 11 and 12, 2022, Scottsdale Police arrested three people "leaving Loyalty Lounge" after they were stopped and found to have warrants and be in possession of a firearm.  There had been a fight outside the Lounge and the people who had weapons were denied entry. It was also reported that a staff member of Loyalty Lounge was checking a rifle outside.

45.    Despite no violence occurring inside the establishment, the liquor license was summarily suspended and the business ordered to shut down.  The claimed basis for the shutdown was A.R.S. §41-1092.11(b), public safety concern and §4-210 licensing issues resulting from the "concern."

46.    The sending of information to the landlord resulted in Plaintiffs being put in "default" with the landlord. That process was also related to the landlord refusing to continue to assess potential buyers for reassignment and an eventual eviction.

47.    On July 29, Plaintiff Durr made a public records request for the following departmental reports alleged to have been the reason for the suspension and subsequent revocation of the license. Scottsdale Departmental Reports #22-14612, #22-17283, #22-12157, #22-12206, and #22-12215. It took three months to provide the reports.

48.    The Loyalty Lounge won restaurant of the year yet oddly, and falsely, the claim was that it failed the audit with 9.09% food sales resulting in a violation of the liquor laws. On its face, this claim of a restaurant of such acclaim is impossible. An alleged audit began in March of 2022 and was supposedly completed in May. Plaintiff Durr followed up in June on the results. She then met with Defendant Scottsdale internal

affairs in the police department to address her concerns and Defendant Scottsdale failed to act.

49.     Emails and questions asked leading up to the failed audit raised red flags. The zoning division through Defendant Stephen Smith wrote false reports and used the Scottsdale Police Department as witnesses to his claims. Plaintiff hired an expert that has audited for liquor boards on an interim bases and works with POS systems. The expert rechecked the numbers and which showed Scottsdale's numbers were wrong yet the Liquor Board refused to adjust their position and refused to give Plaintiff additional time to do a formal response.

50.     The complaint forms stated Defendant Smith personally inspected the business but when confronted and told he was not seen inspecting or even on premises, he admitted he took information fed to him from SPD.

51.     Defendant Smith used the information even though he said he was required to state that he personally was the inspector.  After being called out, he revised the next complaints to state witnesses reported.

52.     When it was time to go to court, Plaintiffs learned that Christian Bailey was his witness.   Defendant Bailey had submitted false information on two reports he submitted to the Liquor Board regarding the establishment. The report submitted dated June 14, 2022, like an earlier report, was false.

53.     Defendant Bailey alleged in the June Report that there was a fight at the establishment and weapons were pulled. He claimed threats were made to kill and shoot up the establishment. This information was not true according to staff who was present and other witnesses.   Defendant Bailey alleged that the reported information was regarding the customers and their violent acts that supposedly occurred in front of Loyalty staff at the front door and not in the actual establishment. His allegations were based on an "innocent bystander and not anyone from Loyalty's" which the business denies.

54.     Masked patrons were specifically denied entry and were upset.  Defendant Bailey stated more than one person who was seen leaving Loyalty's refused to stop when directed to do. There was no proof that the person left Loyalty's. There were no names mentioned to the liquor board regarding all of the people allegedly leaving Loyalty's.

55.     Loyalty's was not the only lounge on the block. There were also public roads.  However, there are no Black owned restaurant lounge type businesses with a series 12 liquor license in Old Town Scottsdale to Plaintiff's knowledge.

56.     Defendants were targeting Loyalty's and did so because Plaintiff Durr is a Black female and police did not want her son around, who is also Black.

57.     On June 10, Plaintiff Durr client received a verbal audit failure from the agent with a two week deadline and strangely, the agent continued to mention her son when talking to her about the audit despite him having no ownership in the business.

58.     On June 14, 2022 the report was sent to the State Liquor department by Defendant Bailey alleging violence from Loyalty's customers.

59.     On June 15, there was message left to inform Plaintiff Durr of the alleged violence at her establishment over the weekend. When she called Defendant Bailey back, he talked around his reason for calling and when she asked him the reason for the call, he assured her that it was one occurrence and she had nothing to worry about.

60.     On June 15, Plaintiff Durr sent an email to the liquor board and included Defendant Bailey and referenced the allegation and the conversation. Around the same time, there was a phone interview with Plaintiff's son and a yet unknown female officer.

61.     Plaintiff Durr then spoke with compliance officer and was told she had to surrender her liquor license or have it revoked despite her wanting to present the evidence that the claims by Defendants were false.

62.     On June 17, just before the doors were set to open, Plaintiffs were told that they could not allow anyone entry other than staff.  On June 17, 2022, a suspension of the

11

license by the Liquor board was made due to false claims by Defendants about violence by customers and staff as well as claimed firearms being present at the facility.

63.    On June 22, Plaintiff Durr sat with the liquor board and a representative from the attorney general's office. They brought up false information that the values were off and there was missing ending inventory. The missing items were proven to be rung up incorrectly in the POS system but they refused to listen.

64.    Bob Dorn, the compliance officer, gave deadlines but would not provide any details in writing.  As a result, Plaintiff Durr surrendered her liquor license which was based on false information from Defendants. The documents show a date of July 13, 2022 with the liquor board as a hearing for the Audit, however, due to false information they were given, the staff threatened Plaintiffs and gave a July 6 deadline to voluntarily surrender the license.  They stated that if she did not, her license would be revoked and she would likely not get another opportunity to get licensed again for a minimum of a year. Plaintiffs were also falsely advised that the license would be revoked due to a claimed percentage of alcohol to food sales. These numbers were false.

65.    When asked the reason for the call from Defendant Bailey, Dorn said he asked were there any questions about the PSP he stated he just wanted to check in etc. His message was referenced that he was also informed that Plaintiff Durr's attorney was on the call and he stated "I don't need to speak to your attorney."  Defendants worked with the Department of Liquor to use these two issues to force the surrender of the liquor license and eventual loss of the business.

66.    Plaintiff Durr was ignored and not given any chance to address the false claims. Her business was shut down by the State Liquor Board due to the false claims by Defendants. The suspension by the liquor board not only was immediate, it stopped liquor sales as well as food sales, the full operation which resulted in lost jobs, relocated staff members, an early retired owner too young for substantial retirement benefits, a relocated family with bills to pay, and left no alternatives for Plaintiffs from these

unlawful actions. The decision to surrender the license was based on the forced shutdown of the entire business and the false claims by the liquor representative claiming there were o defenses based on the claims by Defendants.

67.    After the Liquor Board meeting on June 17, 2022, Plaintiffs were not permitted to sell food or any non-alcoholic beverages or anything until after surrendering the liquor license on July 6, 2022 causing a large loss in revenue given big Juneteenth Black Holiday Weekend and the July 4 holidays. Plaintiffs had refrigerated items but had no freezer space because they would have been used for those events as they had a large number of reservations, artists, and events planned.  According to the State Liquor Department, Plaintiffs were not permitted to sell food from the day the doors were locked on June 17, 2021. They failed to even advise Plaintiffs about non-alcoholic service until inquiries were made by Plaintiffs after the surrender of the license.

68.    This shutdown caused a large financial loss which was ordered without investigating properly the claims by Defendants.

69.    As it was clear that the revocation was a done deal, and given the false information from the Defendants resulting in the liquor board not entertaining anything she brought to the table, Plaintiff Durr had to surrender her license to avoid her business being shut down indefinitely as any reopening would be at their discretion.

70.    Plaintiff Durr then attempted to sell the business and the landlord continued to block the sale so that it could get a new tenant. It is believed that the landlord was working in conjunction with the Defendants.

71.    Additionally, Defendants kept claiming there was a Public Safety Plan that was not approved, however, for 14 months Defendant Bailey and his agents kept rejecting the submitted plan for false reasons. Plaintiff Durr met with Scottsdale Internal affairs on June 7, 2022 and the Plan was finally approved.

## COUNT ONE
**Federal Civil Rights Claims Under 42 U.S.C. § 1983**

13

**(Violation of Fourteenth Amendment Equal Protection- race)**
*Plaintiff Durr against Defendants Bailey and Smith*

72.    Plaintiffs hereby incorporate by reference all paragraphs as though fully set forth herein.

73.    The equal protection clauses affords Plaintiff Durr a right to be free from racial discrimination. *See, e.g., Washington v. Davis*, 426 U.S. 229, 239-41, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976).

74.    Defendants worked in concert and/or in combination with themselves and/or the landlord to remove a Black business owner from the property.

75.    As a direct and proximate result of Defendants' actions, Plaintiff Durr suffered damages as set forth herein.

## COUNT TWO
**Federal Civil Rights Claims Under 42 U.S.C. § 1983**
**(Violation of Fourteenth Amendment Equal Protection-gender**
*Plaintiff Durr against Defendants Bailey and Smith*

76.    Plaintiffs hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

77.    The equal protection clauses affords Plaintiff a right to be free from gender discrimination. *Personnel Administrator of Mass. v. Feeney*, 442 U. S. 256, 274 (1979)

78.    Defendants worked in concert and/or in combination with themselves and/or the landlord to remove a female owned business from the property.

79.    As a direct and proximate result of Defendants' actions, Plaintiff Durr suffered damages as set forth herein.

## COUNT THREE
*Monell* **Federal Civil Rights Claims Under 42 U.S.C. § 1983 (Unconstitutional Policy and Custom; Failure to Supervise & Discipline; Failure to Train; Negligent Hiring)**
*- Plaintiffs against City of Scottsdale*

80.     Plaintiffs hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

81.     When a widespread custom of a municipality impacts disproportionately on one gender or race, an equal protection violation arises "only if that impact can be traced to a discriminatory purpose." *See Personnel Admin. of Mass. v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). The disproportionate impact is only relevant to the extent that it "reflects a discriminatory purpose." *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976).

82.     Defendant City of Scottsdale, through Wathall and SPD, has either failed to properly hire, supervise, discipline, monitor, terminate and/or train its employees and/or failed to establish policies and procedures that would prevent individuals that were not fit for duty from being hired, employed, employed without supervision and retained as a police officer, within the SPD.

83.     Defendant City of Scottsdale has either failed to properly hire, supervise, discipline, monitor, terminate and/or train its employees and/or failed to establish policies and procedures that would prevent individuals that were not fit for a zoning enforcement position from being hired, employed, employed without supervision and retained as a zoning officer.

84.     As such, Defendant COS's policies, procedures, customs, and practices led to Plaintiffs' injuries as Defendant COS's policies, procedures, practices, and customs reflect a deliberate indifference to the Constitutional rights of its inhabitants, including Plaintiffs, as Defendant COS has historically and systemically failed to ensure that its officers will not commit constitutional violations against its citizenry like those committed against Plaintiffs.

85.     The customs/practices of Defendant City of Scottsdale directly and proximately caused the violation of Plaintiffs' Constitutional rights and other damages as more fully set forth herein.

86.     Defendant City of Scottsdale directly and proximately caused the violation of Plaintiffs' Constitutional rights and other damages as more fully set forth herein, with its encouragement, toleration, ratification, and deliberate indifference to the policies, or patterns, practices, and customs, as well as its deliberate indifference to the need for more or different employment screening, training, supervision, investigation, or discipline based on the circumstances contained herein.

87.     As a direct and proximate result of Defendants' actions and/or inactions, Plaintiffs suffered damages more thoroughly described herein. These actions included ignoring the internal affairs report, failing to properly investigate that report, and failure to adequately supervise and train Defendants Bailey and Smith.

## COUNT FOUR
### Arizona Law Claims Gross Negligence
### *All Defendants*

88.     Plaintiffs hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

89.     As set forth above, the information given to the Arizona Liquor Board was false. Knowingly giving false testimony can amount to a police officer's "conscious disregard of the law or the rights of others" sufficient to support a claim of gross negligence." *Landeros v. City of Tucson,* 171 Ariz. 474 (App. 1992).

90.     As a direct and proximate result of Defendants'/Officers actions/inactions, Plaintiffs suffered damages as more thoroughly described herein.

## COUNT FIVE
### -   Interference with Contract
### *Plaintiffs against all Defendants except Smith*

91.     Plaintiffs hereby incorporate by reference all paragraphs as though fully set forth herein.

92.     Plaintiffs had a lease with the existing landlord and were in the process of selling the business, Loyalty.

16

93.    The actions of the Defendants caused buyers to reevaluate the case and caused the sales to not go through.

94.    Defendants/Officers and individuals employed by the City of Scottsdale. worked in concert with one another in a plan to cause Plaintiffs to lose their hard earned business,

95.    As a direct and proximate result of the excessive and unreasonable force used upon Javon (Plaintiff's son), Plaintiffs sustained the damages more fully described herein.

**COUNT SIX**
-    **Abuse of Process**
-    ***Plaintiffs against all Defendants except Smith***

96.    Plaintiffs hereby incorporate by reference all paragraphs as though fully set forth herein.

97.    The two essential elements of a claim for abuse of process are (1) a willful act in the use of judicial process (2) for an ulterior purpose that is not proper in the regular conduct of the proceedings. *Crackel v. Allstate Ins. Co.,* 208 Ariz. 252, ¶ 11 (App. 2004).

98.    Here, Defendant Bailey committed a willful act when he presented fabricated records to the Arizona Department of Liquor and Defendant Smith committed a willful act when he presented false information related to the City of Scottsdale proceedings.

99.    Defendants did not create the reports in the regular course of business for the City of Scottsdale but instead did so for an ulterior purpose that being that they did not want a Black female run business in the area.

100.    Plaintiffs sustained the damages more fully described herein.

Punitive Damages

101.    Plaintiffs assert that Defendants acted with an evil mind in targeting Plaintiffs.

102.    Defendants' conduct was "outrageous, oppressive or intolerable," and "create[d] [a] substantial risk of tremendous harm," thereby evidencing a "conscious and deliberate disregard of the interest[s] and rights of others."

**PRAYER FOR RELIEF:**

WHEREFORE, for the foregoing reasons, Plaintiffs request the following against all Defendants:

A.    Judgment in favor of Plaintiffs in an amount to be proven at trial, including compensatory damages, loss of income, emotional damages; loss of wages; and diminution in earning capacity;

B.    Pre and post judgment interest at the highest permissible rate;

C.    Punitive damages against all Individual Defendants under Federal law and to the extent allowed under State law;

C.    Reasonable attorneys' fees and costs to the extent allowed under State and Federal law;

D.    Trial by jury as to all issues so triable; and,

E.    For such relief to which Plaintiffs are entitled and is just and proper.


DATED this 1st day of May, 2023.

By: _/s/ Kimberly A. Eckert
Law Offices of Kimberly A. Eckert
Attorney for Plaintiffs

18